UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| IN RE ALPHA TELCOM, INC., et al. | )  CV 01-1283-PA |
| | ) |
| | )  **OPINION AND ORDER** |

**PANNER, J.**

Receiver Thomas Lennon ("Receiver"), the law firms of Allen
Matkins Leck Gamble Mallory & Natsis LLP ("Allen Matkins") and
Foster Pepper Tooze LLP ("Foster Pepper"), and the accounting
firm of Mack Barclay, Inc. ("Mack Barclay") --collectively, the
"Fee Applicants"-- seek interim payment of fees and expenses for
services performed between August 27, 2001 and December 31, 2004,
in connection with the receivership of Alpha Telcom, Inc. and
several related companies.

<u>**Amounts Requested**</u>

The Fee Applicants request an award of $1,618,676.53 in
fees, and $84,073.48 in expenses,[1] a total of $1,702,750.01.  Of
that amount, $1,540,882.36 would be payable immediately, and the
remainder payable at some unspecified later date.

---

[1] Allen Matkins reduced its original expense request by
$990.00 after determining it could not adequately document
certain items.

| APPLICANT | FEES REQUESTED | EXPENSES REQUESTED | TOTAL REQUESTED |
|---|---|---|---|
| Receiver | $  459,775.00 | $     5,391.16 | $  465,166.16 |
| Allen Matkins law firm | $  794,408.50 | $   59,994.51 | $  854,403.01 |
| Foster Pepper law firm | $    48,866.53 | $     4,714.53 | $    53,581.06 |
| Mack | Barclay accountants | $  315,626.50 | $   13,973.28 | $  329,599.78 |
|  |  |  |  |
| TOTAL FEES & EXPENSES for which approval is sought | $1,618.676.53 | $   84,073.48 | $1,702,750.01 |
| To be paid immediately (90% of fees, 100% of expenses) | $1,456.808.88 | $   84,073.48 | $1,540.882.36 |
| Amount to be paid later | $   161,867.65 | $            0.00 | $   161,867.65 |

At the time this application was filed, the Receivership had cash-on-hand of approximately $1,637,675.  The sum requested to be paid immediately would consume about 94 percent of that available cash.  The application covers only services rendered through 2004.  All services rendered since that date will be billed separately.

In response to a direct query by the court, the Fee Applicants revealed that they previously were paid $1,783,314.70 in fees, and $269,012.46 in expenses, for work performed on the bankruptcy case involving many of the same companies.  Additional fees were also claimed in that case, but disallowed by the Bankruptcy Court.  The Fee Applicants state that the work they performed on the Bankruptcy Case "was, for the most part, substantially different from that which was performed in connection with the receivership proceedings."  Response to Order of Court for More Information, p. 2.

/ / / /

## Comments on Fee Petition

Along with the fee application, the Fee Applicants tendered a proposed notice to be sent to the investors, creditors, and other interested parties.  In the court's view, that proposed notice was not reasonably calculated to provide lay recipients with the information necessary to evaluate the fee application and comment upon it.  The court also was concerned with the logistics for processing responses to the notice, and the adequacy of the Receiver's plan for giving the notice recipients access to the details of the voluminous fee application.

The court therefore devised its own notice to the investors, form for submitting comments, and plan for making the details of the application available.  The court overruled the Receiver's objections, and ordered the Receiver to disseminate the notice.

15,790 notices were mailed, of which 2,490 were returned as undeliverable.  Many investors have died during the years this case has been pending, and the list had otherwise grown stale.

Nevertheless, out of 13,300 notices delivered, the court received approximately two thousand responses.[2]  Many responses were critical of the Receiver's performance, or questioned why the Receiver and his attorneys were being paid so much when the investors have never received any funds from the receivership, and it is unlikely they ever will receive any money.  Another

---

[2] A small number of responses were duplicative, or appeared fraudulent.  The court directed that one batch be docketed with a warning "**NOTE: All of these Comment Forms appear to be from the same person.**"  (Docket # 507).  The court also is aware of efforts by certain former sales agents to elicit fraudulent responses.  However, the vast majority of the responses received are, from all indications, legitimate.

common theme was that the Receiver has failed to keep the
investors informed regarding developments in the case.

According to the Receiver's computations, 63.4% of the
responses opposed the fee application in its entirety.  29.3%
said the applicants were entitled to some compensation, but not
the full amount requested.  Only 7.2% of the respondents
supported payment of the full amount sought.  Those upset with
the Receiver may be more likely to respond, but this still
suggests a very high level of discontent among the investors and
creditors.  The Receiver errs by dismissing the many comments
received as mere "canned responses."  Fee Applicants' Reply
Brief, p. 10.

The Receiver acknowledges the frustration of the investors
and creditors.  Nevertheless, the "Receiver asserts that the vast
majority of investors and creditors' responses are not relevant
to the factors that the Court is to consider in approving the Fee
Applications."  Reply Brief in Support of Fee Applications, p. 3.
The Fee Applicants also note that the Securities and Exchange
Commission ("SEC") has endorsed the fee request, apart from
urging a larger "holdback" for the attorneys, *i.e.,* that some
earned fees be withheld until the case is complete.

### Legal Standards

The court appointing the receiver has full power to fix the
compensation of such receiver and the compensation of the
receiver's attorney or attorneys.  Drilling & Exploration Corp.
v. Webster, 69 F.2d 416, 418 (9th Cir. 1934).  Many factors enter
into that calculus.  See, e.g. United States v. Code Products

Corp., 362 F.2d 669, 673 (3d Cir. 1966) (primary considerations in fixing receiver's compensation are the fair value of his time, labor and skill measured by conservative business standards; the degree of activity, integrity and dispatch with which work is conducted; and the result obtained, the last being a "critical factor"); In re Imperial '400' National, Inc., 432 F.2d 232, 237 (3d Cir. 1970) (court should consider economy of administration, the burden the estate may safely be able to bear, the amount of time required to perform the necessary services, and the overall value of those services to the estate).

The court has considerable discretion in fashioning a fee award that is appropriate under the circumstances, Gaskill v. Gordon, 27 F.3d 248, 253 (7th Cir. 1994), and that will reasonably, but not excessively, compensate the professionals for their efforts. In re Continental Ill. Sec. Litig., 962 F.2d 566, 572-73 (7th Cir. 1992).

Interim fee allowances are appropriate where both the magnitude and the protracted nature of a case impose economic hardships on professionals rendering services to the estate. Matter of Interstate Stores, Inc., 477 F. Supp. 14, 16 (S.D.N.Y. 1977). Interim fees are generally allowed at less than the full amount requested in recognition of the fact that until the case is concluded the court may not be able to accurately determine the "reasonable" value of the services for which the allowance of interim compensation is sought. In re Bank of New England Corp., 134 B.R. 450, 459 (Bankr. E.D. Mass. 1991), aff'd, 142 B.R. 583 (D. Mass. 1992). See also In re McGann Mfg. Co., 188 F.2d 110,

112 (3rd Cir. 1951) (interim fee award "should be well below any possible final allowances, for overly generous interim allowances might place an incentive on procrastination"); In re Imperial '400' National 432 F.2d at 235 (when interim fees are awarded, the allowances granted should be well below any possible final allowances, both because overly generous awards might encourage procrastination and because it is only at the conclusion that the value of the services can be appropriately measured).

Some cases suggest the SEC's views must be given "great weight." See S.E.C. v. Fifth Avenue Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973). No statute compels such a conclusion, however, nor do I believe such great deference is warranted in this instance. Cf. In re Imperial '400' National, 432 F.2d at 240 (special deference to views of SEC were warranted in that specific instance "[b]ecause of its experience in such matters, its impartiality, and its sole familiarity with the relevant facts in this case"). Rather, I consider the SEC's views *quantum meruit*, along with all other relevant factors.

## Discussion

The Fee Applicants have worked on this matter since 2001, expending considerable resources in that endeavor. An interim award therefore is appropriate. The amount of that award must now be determined. The investors have been highly critical of the Receiver's performance. Some of those criticisms are warranted, others are not.

Some investors incorrectly assume that the Receiver and his attorneys are the wrongdoers who perpetrated the fraud in the

first place, and question why these wrongdoers should be paid anything.  Actually, the Receiver is employed by the court.  He became involved only after the SEC furnished evidence of wrongdoing within the company.  The Receiver is not affiliated with the persons responsible for the failure of the company.

Some investors complain that the Receiver's actions caused the IRS to disallow tax credits those investors had claimed, ostensibly for having installed telephone equipment suitable for use by persons with disabilities.  The investors were never entitled to take such a deduction in the first place.  That was a false marketing scheme aimed at making the payphone securities appear a better investment than they actually were.

A number of investors fault the Receiver for closing the business and selling the payphones.  The Receiver did so with the court's approval.  Alpha Telcom's business model was a failure. Payphones were scattered around the country, greatly increasing the cost to service the phones at a time when cell phones were making major inroads into payphone profits.  Alpha Telcom gave the appearance of being a viable business only because capital contributions from new investors, *i.e.,* those who "purchased" payphones, were used to subsidize operating losses and pay 14% returns to existing investors.  It was not feasible to continue operating the business.  Nor were the investors entitled to be paid the proceeds from the sale of "their" telephones.  I have already determined that the investors purchased only securities, not the actual telephones.  Furthermore, little was realized from the sale of those used telephones scattered around the nation.

If anything, the Receiver can be faulted for not leveling with the investors sooner.  The only hope many investors had of recovering any portion of their investment in Alpha Telcom was to immediately bring an action against the person who sold them the unregistered security, or against the financial advisors who urged clients to sell stodgy certificates of deposit and invest the proceeds in Alpha Telcom.  It is likely too late to bring such an action now, given the statute of limitations and the passage of time.  Refusing to declare the investment worthless also has hindered the investors' ability to claim the investment as a bad debt for income tax purposes.

The Receiver has accomplished some tasks, such as winding down the company's operations and disposing of the remaining assets, and unraveling the company's tortured finances.  Some of that work, but certainly not all, has previously been compensated in connection with the bankruptcy proceedings.

The Receiver also has endeavored to recover assets to benefit the investors.  To date, those attempts have been only marginally successful.  Cf. Code Products, 362 F.2d at 672 ("From the standpoint of what was accomplished by this receivership, it may be said that it was not conspicuously successful nor was it in any sense disastrous").

The Receiver did recover some real property that had been gifted to a third party, and some income tax refunds.  The Receiver also obtained about $20 million in judgments against the former sales agents but, to date, has been able to collect only a small fraction of that amount.  In addition, the Receiver and his

attorneys may have jeopardized those collection efforts by the manner in which they pursued the case against the former agents. See In re Alpha Telcom, 2004 WL 3142555 (D. Or. 2004) at *1-3. Their handling of that matter certainly prolonged and complicated the case and increased legal costs. Cf. United States v. Larchwood Gardens, Inc., 404 F.2d 1108, 1114 (3rd Cir. 1968) (receivers and their attorney not entitled to compensation for time spent surmounting difficulties caused by their own improper, though well-intended, course of conduct); Nowell v. International Trust Co., 169 F. 497, 505 (9th Cir 1909) (receiver's fee award may be reduced where he unnecessarily prolonged the receivership, to the detriment of the affected parties).

The court also is concerned by the Receiver's decision to hire counsel in Los Angeles, and to pay California hourly rates for attorneys, without any showing that competent counsel could not be retained here in Oregon at a fraction of the price. Perhaps the Receiver prefers to work with attorneys he knows, but the receivership should not have to pay the added cost. This reliance on California counsel also required the Receiver to retain "local counsel" in Oregon, at a cost of over $50,000. Judging by the time sheets, local counsel's contribution to the case often consisted of reading e-mails and filings, and passing them on to the California attorneys, and coordinating filings in Oregon. Many of these matters might have been handled by a competent legal secretary if lead counsel were based in Oregon.

In fixing the amount of fees to be paid to the Receiver and his attorneys, an important consideration is the extent of the

assets available to pay any such fees, and the extent to which the investors and creditors have benefitted (or not) as a result of the Receiver's endeavors. Specialty Products Co. v. Universal Indus. Corp., 21 F. Supp. 92, 94 (M.D. Pa. 1937). See also S.E.C. v. W. L. Moody & Co., 374 F. Supp. 465, 480-81 (S.D. Tex. 1974) (size of the estate and its ability to afford the expenses and fees is a consideration).

After five years on the job, the Receiver has not returned any money to the investors, and he probably never will. The Fee Applicants now propose to use essentially the entire assets of the receivership to pay their own fees. That is very troubling.

To be sure, compensation to investors and creditors is not the only criteria by which a receiver's performance must be judged. A receiver is not hired on a strictly contingent basis. He is an officer of the court, charged with performing a range of necessary functions and duties, not all of which duties can or will translate into revenue for the receivership.

Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to fair compensation for his efforts. SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992); Donovan v. Robbins, 588 F. Supp. 1268, 1273 (N.D. Ill. 1984).

It also is true that "unfortunately cases will arise where every cent of money on hand will have to be devoted to receivership expenses and still leave services uncompensated." Specialty Products Co., 21 F. Supp. at 94.

Nevertheless, the court is not "required to fix fees in total disregard of the fact that this receivership produced a very lean harvest, that all interests involved suffered heavily, and that the whole enterprise was definitely not a success." Id. See also Spicer v. Chicago Bd. Options Exchange, 844 F. Supp. 1226, 1250 (N.D. Ill. 1993) ("What is left for the class, after fees have been awarded, is always a paramount consideration") (quoting In re Superior Beverage/Glass Container, 133 F.R.D. 119, 126 (N.D. Ill.1990)); Gaskill v. Gordon, 942 F. Supp. 382, 387 (N.D. Ill. 1996) ("court has a duty to ensure that the professionals' fee award is reasonable vis a vis the plaintiff class").

Results are always relevant. W.L. Moody, 374 F. Supp. at 480; Donovan, 588 F. Supp. at 1272; Elliott, 953 F.2d at 1577; Code Products, 362 F.2d at 673 (result obtained is a "critical factor").

A lengthy discussion of all the other factors I have considered, accompanied by a line-item dissection of the timesheets and expenses, would not be an efficient use of judicial resources. I have considered the relevant factors, and determined an appropriate interim fee award.

At this point, the Receiver's performance merits an "incomplete" grade. In addition, as matters stand, there are not sufficient assets to pay even a fraction of the claims upon this receivership. The Receiver is attempting to recover additional assets from the sales agents, but to date has little to show for that effort. I am skeptical those efforts will yield a

substantial recovery for the investors.  However, if the Receiver is successful in recovering additional assets for the receivership, the court has authority to adjust the interim fee award to reflect the changed circumstances.  See <u>Drilling & Exploration Corp.</u>, 69 F.2d at 418.

## Conclusion

The applications for interim fees and expenses (## 436, 439, 440, 441) are granted in part, and denied in part, as follows:

| APPLICANT | FEES ALLOWED | % OF REQUEST | EXPENSES ALLOWED | % OF REQUEST |
|---|---|---|---|---|
| Receiver | $ 229,887.50 | 50 % | $ 5,391.16 | 100 % |
| Allen Matkins law firm | $ 317,763.40 | 40 % | $ 47,995.61 | 80 % |
| Foster Pepper law firm | $   22,433.27 | 50 % | $   4,714.53 | 100 % |
| Mack \| Barclay accountants | $ 268,282.53 | 85 % | $ 13,973.28 | 100 % |
| | | | | |
| TOTAL | $ 838,366.70 | 51.8 % | $ 72,075.29 | 85.7 % |

IT IS SO ORDERED.

DATED this 27th day of October, 2006.


/s/ Owen M. Panner
_____
Owen M. Panner
United States District Judge