UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

IN RE ALPHA TELCOM, INC., et al.          03:01-cv-1283-PA

**OPINION AND ORDER**

**PANNER, J.**

Before the Court are final fee applications of the Receiver
and his professionals.  The Court will issue another Order
regarding the Distribution Plan.

## Overview

Thomas F. Lennon, the Receiver appointed[1] to manage the
affairs of Alpha Telcom, Inc. and its sister companies, advised
the Court that further efforts to recover additional assets were
unlikely to generate sufficient revenue to justify the expense
and recommended this "case be closed following final distribution
to investors, the Receiver, and his Professionals."

On August 14, 2008, the Court entered an order (docket
# 712) accepting that recommendation.  The Court concluded that

---

[1]  On October 30, 2009, the Receiver was replaced by a
Distribution Agent.  Order Replacing Receiver Thomas F. Lennon
with Michael A. Grassmueck as Distribution Agent (docket # 956).

"[f]urther activity by the Receiver and his attorneys would merely risk squandering, on legal fees and other expenses, what little money remains.  Winding up the Receivership is the best option, compared to the alternatives."  Id., p. 2.

The next consideration was how to distribute the limited funds remaining in the Receivership.  The Receiver recommended that the first priority be to pay "administrative expenses," including applications for fees and expenses by the Receiver, his attorneys, and accountants, totaling approximately $1.31 million (excluding amounts previously paid as interim awards of fees and expenses).  A further $50,000 was to be set aside to cover the anticipated costs of winding up the Receivership, such as preparing final accountings and tax returns, destroying documents, and distributing any remaining funds.  The Receiver estimated that after payment of administrative expenses, less than $500,000 would remain to distribute to the thousands of payphone investors.

## Background

In reading hundreds of comment forms received by the Court, it is apparent that many payphone investors have difficulty understanding that their investment is gone and why.  They deserve an explanation.  Those facts also are germane to the Court's resolution of the issues remaining in this case.

Alpha Telcom began as a modest-sized company operating pay telephones and providing some business telephone services.

2 - OPINION AND ORDER

The company subsequently changed its business model.   Alpha

Telcom and its sister companies and subsidiaries (collectively

referred to here as "Alpha Telcom")[2] began "selling" pay

telephones, priced at $5,000 each.[3]   What buyers unwittingly

purchased was in fact not a payphone or a "business opportunity,"

as Alpha sought to characterize it, but rather an unregistered

security.   See SEC v. Rubera, 187 F. Supp. 2d 1250, 1258-60

(D. Or. 2002) ("Rubera"), aff'd, 350 F.3d 1084 (9th Cir. 2003).

Alpha Telcom promised to furnish the payphone, find it a

suitable location, install and maintain it, negotiate contracts

and obtain regulatory approvals, collect revenues, pay the

monthly utility and telephone bills, and then remit to the

investor 30% of the net revenue from that particular pay

telephone.   Alpha Telcom would retain the other 70% as

compensation for its services.   Rubera, 187 F. Supp. 2d at 1255.

---

[2]   For legal and accounting reasons, Alpha and its owner
Paul Rubera eventually divided functions among two entities.
Though presented as a package, most investors signed a "Telephone
Equipment Purchase Agreement" with, and paid money to, American
Telecommunications Company, Inc. ("ATC").   Investors also signed
a "Telephone Services Agreement" with Alpha Telcom, Inc., which
managed the payphone operations, collected revenues, and paid
'profits' to investors.   ATC was created, funded, and at all
relevant times owned and controlled, by Alpha and/or Rubera.
Money flowed freely between the companies, with little if any
actual separation.   Alpha Telcom also controlled Florida Pay
Phone Systems, Inc., New York Pay Phone Systems, Inc., and
Pacific Telcom, Inc.   A separate company, Strategic Partnership
Alliance, LLC ("SPA"), recruited, trained, and supervised a sales
force and developed marketing materials.   This Opinion generally
will not distinguish among these companies unless required for
clarity.

[3]     The price was $4,000 when the program first began.

Alpha would make all decisions and do all the work. The investor need only cash the check that would arrive by mail each month.

Prospective investors were assured that the investor's share of net revenues from a payphone (priced at $5,000) would be at least $58.34 a month, with Alpha Telcom covering any shortfall. Id. Regardless of whether a particular payphone earned a profit or even lost money, the investor still would receive at least $58.34 a month (i.e., $700 a year, or 14 percent per annum) for each $5,000 that person invested in the Alpha Telcom program.

The Alpha Telcom package also included a "buyback" option. An investor could sell the payphone (or more accurately, the unregistered security) back to Alpha Telcom for the original purchase price, less a penalty if the option was exercised before thirty-six months. Id. Beginning around May 2000, Alpha Telcom represented that all new sales would include "buyback insurance" guaranteeing an investor would be paid even if Alpha Telcom itself was unable to repurchase the phones. Id. Many investors were even told that Lloyds of London was among the insurers.[4]

A fourteen percent return on a risk-free investment appeared very attractive, at a time when certificates of deposit and other safe investments were paying much lower returns.

Hundreds of sales agents (whether styled as financial planners, estate planners, or other titles) aggressively promoted

---

[4] Around mid-December 2000, the references to Lloyds of London were eliminated.

the Alpha Telcom product and received a large commission on each sale the agent made.  SPA, the company that recruited and supervised the sales agents, also made a substantial profit on each sale.  Misrepresentations were made to encourage sales. Many elderly persons, and those otherwise dependent on investment income, were persuaded to take money out of relatively safe investments and invest in what was at best an extremely risky venture and at worst a Ponzi scheme.  See SEC v. Ross, 504 F.3d 1130, 1133 (9th Cir. 2007) ("while Alpha Telcom's business plan was curiously anachronistic—selling service contracts on pay phones—its business model was timeless: the Ponzi scheme.")

In less than three years, Alpha Telcom obtained at least $133 million from payphone investors.  Decl. of Christopher R. Barclay (# 168, "Barclay Decl."), p.2; Debtors' Motion for Order Establishing Auction Sale, etc. (Bktcy. # 258), p. 9.  For a time, the company maintained the appearance of profitability. Yet when a Receivership was imposed in 2001, it was determined that Alpha Telcom had relatively few assets of value.  Indeed, Alpha Telcom filed for bankruptcy protection shortly before the SEC filed this action.

The Receiver immediately discovered Alpha Telcom's records were a shambles and its financial controls severely deficient. The Receiver's firm and accountants devoted considerable time toward obtaining an accurate financial picture, though some figures can only be estimated.

5 - OPINION AND ORDER

Approximately $17.9 million in payphone "profits" were paid to payphone investors during the three year period from July 1, 1998 to June 30, 2001.  Rubera, 187 F. Supp.2d at 1257; Barclay Decl., pp. 3-5.  During that time, Alpha Telcom's payphone operations actually operated at a loss, even if solely considering just the direct costs of operating the payphones. Rubera, 187 F. Supp.2d at 1257.

The $17.9 million in phantom "payphone profits" was derived by cannibalizing the funds Alpha Telcom received from payphone investors.  The supposedly risk-free principal actually was being used to pay the promised 14% return on investment.

The sales agents and marketers received approximately twenty five percent of the gross proceeds from sales of the Alpha Telcom product.  The Receiver's accountants estimate those commission payments totaled around $37 million. Barclay Decl., pp. 3, 5.

Overhead consumed about another $33 million.  Id. at 5. Alpha was a poorly run business.  Inventory and accounting systems were inferior and key personnel inexperienced or incompetent.  Rubera, 187 F. Supp. 2d at 1256.  These deficiencies also left opportunity for potential malfeasance.

Alpha paid over $22 million to acquire existing payphone "routes" from other companies.  Another $9 million was used to acquire telephones and other equipment and inventory, a fleet of vehicles (214 when the Receiver took control, though of limited value because of outstanding loans), and other items.  Millions

of dollars went to owners and insiders of Alpha Telcom and its inter-related companies. Millions more went to investors who exercised the buyback option or canceled orders.

Beneath the facade of profitability, Alpha Telcom was hemorrhaging red ink. And the situation was growing worse.

The payphone industry was in decline, as cell phones and other portable communication devices became prevalent. Revenues per phone were falling. Saturation also was a problem, as many desirable locations already had one or more phones.

Acquiring payphones from the manufacturer, identifying a good location, entering into necessary contracts, installing phones, and attending to other details was time consuming and costly. Geography also mattered. If payphone sites were too widely scattered, the cost of installing and maintaining the phones might be too high to justify the revenues obtained.

By Fall 2001, Alpha had a very large backlog of unfilled orders. Id. Alpha hired a company (ATMN/EMI) to acquire new sites. The owners of SPA, marketers of the Alpha Telcom product, were secretly principals in ATMN/EMI. Alpha paid ATMN/EMI $350 for each site acquired. Many sites proved worthless. Some purported sites were in burned-out buildings, vacant lots, other unsuitable locations, or simply did not exist. Id.

The backlog of unfilled orders continued to grow, even as sales of the Alpha Telcom product continued at a rapid rate. By Spring 2001, Alpha Telcom had accepted money from investors for

7 - OPINION AND ORDER

thousands of payphones that did not exist or were not installed
and operating, although the investor to whom the phone nominally
was assigned may have been told otherwise.  Many of those
investors received monthly payments of $58.34 anyway.[5]

Alpha Telcom's business model was not sustainable.  In the
short run, the company might survive by inducing more persons to
invest or existing investors to risk more money.  Yet the more
payphones Alpha "sold," the more money the company lost.  From
July 1, 1998 through June 30, 2001 Alpha Telcom actually lost
over $100,000 simply by operating its payphones.  Id. at 1257.  On
top of the direct operating losses, Alpha Telcom returned
$17,000,000 to payphone investors during that time period.  Id.
Alpha Telcom could not continue paying 14% a year regardless of
whether a phone actually earned that much profit.  But if the 14%
payments ended, the flow of new money would dry up and many
investors would exercise the buyback option, compounding Alpha
Telcom's losses.

Several states were investigating Alpha Telcom for selling
an unregistered security (the Alpha Telcom program) or had
determined that what they were selling was a security.  Buyback
requests increased.  Alpha honored some but quickly ran short of
money to pay buybacks, make monthly payments to investors, pay

---

[5]  Alpha briefly paid 7% "interest" to some investors for
phones that did not yet exist or had not been installed, though
some others apparently were paid 14%.  Alpha's internal controls
were so poor that the status of a phone might be incorrectly
recorded or payments made regardless of the phone's status.

vendors and overhead, and to install and operate payphones.

Alpha Telcom used various means to dissuade investors from exercising the buyback option, including letters of assurance and reminders that the investment was fully protected by buyback insurance. Investors who bought into the Alpha Telcom program prior to May 2000, when buyback insurance was first added, were offered a buyback insurance "addendum." The cost was ten percent of the original price paid for each phone to be covered, i.e., $500 if the original price paid was $5,000.[6]

If an investor insisted upon exercising the buyback option, the contract required that the investor be paid within 30 days. Alpha devised ways to delay those payments.[7]

These tactics merely delayed the inevitable. By June 2001, to meet the $58.34 a month standard, Alpha Telcom would have to pay investors an estimated $1.3 million a month ($15 million a year) in non-existent "profits" from payphone operations.

Alpha Telcom did not make the June payment. More investors

---

[6] Selling insurance addendums was a high priority, because an investor who bought an addendum would then rescind the buyback demand. Consequently, only $50 of the $500 per phone fee was kept by Alpha Telcom. The remainder was retained as a commission by SPA and the agent who sold the insurance addendum.

[7] For example, Alpha Telcom invoked a provision in the buyback agreement requiring a returned phone to be free of encumbrances or liens. Alpha argued the "Telephone Services Agreement" by which Alpha agreed to manage and service the phone, was such an encumbrance. Accordingly, Alpha claimed an investor first had to give Alpha 90 days notice to terminate their contract before the investor would be eligible to exercise the buyback option (and then had to wait 30 more days to be paid).

exercised the buyback option, but Alpha Telcom lacked the funds to buy back the phones, *i.e.*, to repay the investment principal. Nor, without a continuous influx of new money, could Alpha Telcom pay its large overhead and other expenses. The house of cards quickly crumbled.

The buyback insurance proved a sham.  The primary insurer, Northern & Western Insurance Company ("N&W"), was an "offshore" company established by persons closely affiliated with Alpha Telcom.  N&W's assets never were enough to cover more than a tiny fraction of the sums purportedly insured.

Alpha was to maintain an escrow account, known as a "sinking fund," to cover the first two million dollars in buyback claims. At one time, sufficient funds had been in that account, but most of the money was then diverted to other purposes.

### The Receivership

In August 2001, Alpha Telcom filed for bankruptcy protection.  The SEC filed this action in September 2001.  The Court appointed a Receiver, Thomas Lennon, to manage the affairs of Alpha Telcom.  Lennon had extensive experience as a Receiver in situations of this kind, as did the attorneys, accountants, and some of the other persons who assisted him.

The SEC (and Receiver) did not cause the investors to lose their money, but simply exposed the Alpha Telcom program for what it was and prevented more persons from becoming victims. Unfortunately, by the time the SEC filed action in September

2001, the payphone investors' money already was gone.

For simplicity, the Court generally will refer to actions by the "Receiver" even if the task actually was performed by, or with the assistance of, his accountants, attorneys, and staff.[8]

Much of the initial efforts by the Receiver were directed at stabilizing the company and striving to preserve whatever value there was in the existing payphone installations.

The Receiver had to unravel Alpha Telcom's complex and poorly documented finances, ascertain Alpha's assets and liabilities, determine what bank accounts, offices, warehouses, and other facilities the company had, take control of these assets, and attempt to reorganize the company's operations. Report of Receiver Thomas F. Lennon as of October 18, 2001 (docket ## 59, 86) ("Receiver's October 2001 Report").

The Receiver implemented accounting and cash management controls that had largely been absent at Alpha Telcom prior to the Receivership. He made sure essentials such as workers compensation and liability insurance were in place and premiums paid. Id., pp. 6-14. Revenues owed to Alpha Telcom had to be collected and accounted for, telephones serviced, and the vendors and site owners paid. Id., pp. 8-13.

A further priority was to understand the status of the company and analyze the viability of continuing to operate Alpha

---

[8]    At times, the Receiver also benefitted from documents the SEC obtained, or investigations SEC staff had conducted.

Telcom and how best to preserve any value for the investors.  Id.

The Receiver concluded that if any value remained in the company, it was in the existing site locations and payphone "routes" (aka "networks") where payphones already were installed, and Alpha Telcom had contracts to operate phones.  Id., p. 16. The Receiver cautioned that "[i]f the payphones are disconnected for any significant period, their value will be lost because site owners will remove and replace the pay phones."  Id.

Upon assuming control of the company, the Receiver and his staff found that many site owners had not been paid, and some had even removed the Alpha Telcom payphones.  Id., pp. 9, 12-13.

Other vendors, such as companies that provide the actual telephone service, also had gone unpaid and were wary of providing additional services without assurance of payment.  The Receiver negotiated with the vendors to continue providing service, and with site owners to keep phones in place.

Alpha's owner admittedly had hired too many of his friends, creating an "enormous and unnecessary payroll obligation," while "key personnel were incompetent."  Defendant Rubera's Post-Trial Brief (# 148), pp. 3-4.  To pay that overhead and other expenses, Alpha had relied on a continuous influx of new money from payphone investors.  Once deprived of that revenue source, Alpha could not pay its bills.

When the Receiver was appointed, Alpha had approximately

$6,000,000 in unpaid trade creditor claims[9] but only $476,786 in its bank accounts. Barclay Decl. in Support of Sale (# 175), ¶ 5. Most of that cash was depleted within the first few weeks just paying the salaries of Alpha's employees and the premiums for required insurance such as workers compensation and coverage for the vehicles Alpha operated. Id.

The Receiver consolidated Alpha's offices and other facilities located around the country. He cut the number of employees by almost 40% (beyond the many positions eliminated in the months just before the Receiver was appointed). (Bktcy # 258, p. 11). Alpha had over 200 vehicles, many heavily encumbered by loans used to acquire them and all of which had to be insured. The Receiver returned nearly half of them.

Alpha lacked contracts to operate large numbers of payphones for particular locations or customers. Instead, Alpha had about 4,000 different site contracts throughout 43 states, requiring Alpha to interact with, and make payments to, numerous site owners and tax authorities. That the payphones were dispersed over a wide area greatly increased the cost of servicing the phones. Trying to reduce costs enough to keep the company afloat, the Receiver began disconnecting some unprofitable phones and narrowing the geographic area where the company operated.

Despite efforts to reorganize the business, reduce overhead,

---

[9] This category does not include such things as salaries, buyback or other obligations to payphone investors, or future payments due on loans or other debts.

and make the company profitable, it soon became apparent that there was little prospect for a successful turnaround.

The American payphone industry was contracting rapidly. An industry trade group summarized the situation in an April 15, 2002 letter to the Federal Communications Commission ("FCC"):

> As the Commission is well aware, the sharp and steady annual increases in wireless phone use have caused a debilitating decline in payphone call volumes and payphone industry profits.[10]

"Dial-around" services (such as calling cards, toll-free numbers, and other methods) also were proliferating. Payphone operators complained the FCC had set compensation rates much too low, and made it procedurally very difficult to collect the money owed. Barclay Decl. (Bktcy. # 260), ¶ 8.[11]

The FCC estimated the number of operating payphones declined by over 200,000 from March 31, 1999 to Mar 31, 2001, and by another 208,579 payphones in the year ending March 31, 2002. This trend continued in subsequent years:

---

[10]    Letter to William F. Caton, Acting Sec'y of the FCC, from attorneys for American Public Communications Council ("APCC"), p. 12, available at http://ecfsdocs.fcc.gov/filings/2002/04/18/5508339748.html  See also Comments of APCC, before U.S. Dep't of Justice, CRT Docket No. 2004-DRS01 (May 31, 2005), p. 6 ([The] number of payphones deployed decreased 31% from 1998 to 2003, largely because of the increased use of cell phones.  Revenues are declining, in some cases precipitously, and many PSPs [payphone service providers] have gone out of business . . . .")

[11]    The FCC eventually made changes, but Alpha Telcom was out of business by then.  FCC Report and Order 04-182, August 12, 2004 ("In the Matter of Request To Update Default Compensation Rate For Dial-Around Calls From Payphones"), available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-04-182A1.pdf

| Year (all data as of March 31) | Total Operating Payphones In United States | Year (all data as of March 31) | Total Operating Payphones In United States |
|---|---|---|---|
| 1999 | 2,121,526 | 2005 | 1,216,175 |
| 2000 | 2,063,718 | 2006 | 1,006,802 |
| 2001 | 1,919,640 | 2007 | 872.256 |
| 2002 | 1,711,061 | 2008 | 700,826 |
| 2003 | 1,495,786 | 2009 | 555,128 |
| 2004 | 1,344,999 | | |

FCC, Trends in Telephone Service (Sept. 2010), Table 7.6.[12]

Estimated payphone revenues in the United States also were rapidly declining:

| Year | Gross Revenues (millions of dollars) | Year | Gross Revenues (millions of dollars) | Year | Gross Revenues (millions of dollars) |
|---|---|---|---|---|---|
| 1998 | 2,536 | 2002 | 1,192 | 2006 | 659 |
| 1999 | 2,218 | 2003 | 1,063 | 2007 | 470 |
| 2000 | 1,932 | 2004 | 1,002 | 2008 | 379 |
| 2001 | 1,585 | 2005 | 924 | | |

Trends in Telephone Service, Table 15.2.

Some payphone companies had enough capital, management skills, and other advantages to survive the downturn.  Alpha Telcom did not.  The Receiver concluded Alpha Telcom could not generate enough profit from payphone operations to survive as an ongoing entity.  Lennon Decl in support of selling phones, etc. (# 176),  p.2; (Bktcy # 258).  Among the reasons cited were:

---

[12]  The 2010 Report, and earlier versions, are available at: http://transition.fcc.gov/wcb/iatd/trends.html

a.    Many of the phones have never made a profit and it does
not appear to be possible for Alpha to generate a profit
from these phones.  It appears that Alpha's accumulations of
phones in this case was focused almost entirely on the need
to acquire more phones as opposed to acquiring profitable
phones.

b.    The Phones owned by Alpha are spread over a very large
geographic area with very few phones in any one location.
As a result, there is virtually no cost effective way to
manage these phones or to manage independent contractors.

c.    Alpha lacks the internal expertise to adequately
reprogram phones on an ongoing basis in order to remain
competitive in the industry.   The Receiver's efforts
to locate qualified people have been unsuccessful in
light of the ongoing bankruptcy and the likely short
term nature of the assignment.

Barclay Decl in support of selling phones (Bktcy # 260), pp. 4-5.

In early 2002, the Receiver advised the Court that Alpha

lacked funds to operate its payphones for much longer.  (## 166,

168, 176).  Recognizing that disconnecting the payphones would

result in loss of site location contracts and any resale value,

the Receiver recommended an immediate sale of Alpha's payphone

routes while they still retained at least some value.

With the approval of both this Court and the Bankruptcy

Court, the Receiver organized a proposed sale of assets and

identified prospective buyers for some assets and tentative

prices and terms for those sales.  (See, e.g, Bktcy. ## 181-83,

258-61).  An auction was held in July 2002 and any sales

confirmed in early August 2002. (Bktcy. ## 283, 682-87, 690).

With the industry rapidly contracting, the market was awash

in payphone routes and used payphone equipment.  Many of Alpha's routes were unprofitable.  Alpha also was in arrears on site commissions and payments to telephone service providers and others.  Some buyers agreed to assume the "cure costs"--and the sale price reflected that.  The nominal sale price was higher if the Receiver agreed to pay any "cure costs," but that expense substantially reduced the net proceeds to the Receivership.

The Receiver eventually was able to sell approximately 6,000 payphones.  According to the Receiver's November 15, 2003 Report, those sales netted just $397,578 - roughly $66 per phone - after payment of post-bankruptcy lease obligations.  (# 213 at p. 3).

The Receiver considered removing the remaining telephone equipment and trying to sell it, but concluded the cost of removal and sale would greatly exceed the anticipated revenues.  (Bktcy # 698, p. 2).  Considering the payphone market at that time, the Receiver's conclusion came as no surprise.  In short, many of the payphones and payphone routes were worthless.

The Bankruptcy Court authorized the Receiver to abandon the payphones he was unable to sell, reject those site contracts, and liquidate remaining assets such as inventory.  (Bktcy ## 714 and 717-18).

By the end of September 2002, the company had been closed and most assets liquidated.  With that phase of the case concluded, the Bankruptcy Court proceedings were dismissed.  All remaining matters would be handled in this Court.

Attention then shifted to the remaining potential sources of substantial revenue. The SEC had obtained a judgment against Alpha Telcom's owner, Paul Rubera. The judgment proved difficult to collect upon, but the Receiver eventually gained control over and sold a Connecticut property. The Receivership netted around $180,000 from that sale. (# 439, p. 16).

Alpha Telcom (and its affiliates) had reported non-existent profits in its financial statements and paid corporate income taxes on those profits. The Receiver negotiated with the IRS and state tax authorities and eventually obtained approximately $1.5 million in tax refunds for the Receivership.

The largest remaining source of potential revenue was the estimated $37 million in commissions received by those who sold the Alpha Telcom product. This Court had determined the Alpha Telcom product was an unregistered security. Securities laws prohibit selling an unregistered security.

The Receiver (with the SEC's endorsement) sought to compel the agents to repay those sales commissions. The Receiver and SEC argued, and this Court subsequently agreed, that each agent legally was obligated to return ("disgorge") to the Receivership the amount that agent had received in commissions.

The Receiver (and his attorneys and accountants) spent considerable time identifying which sales agents had received commissions and how much. Those agents then had to be located and a determination made whether it seemed feasible to collect

from that agent.   The sums received by some agents did not
justify the anticipated cost of legal proceedings.   Some other
agents had died, filed for bankruptcy, or used various means of
concealing or shielding assets.

The Receiver eventually identified a list of agents to
pursue.   Some agents entered into settlement agreements with the
Receiver, and some others voluntarily made restitution to persons
to whom they had sold the Alpha Telcom product.   The Receiver
then asked this Court to enter judgment against the remaining
agents.   After considerable litigation, in which many sales
agents vigorously participated, the Court entered a judgment for
over $20 million against those sales agents.   (# 385).
Considerable efforts were then made to collect on that judgment,
with significant expense but limited success.

The former sales agents, led by Ernest Bustos, appealed.
The purpose of the appeal was to prevent the sales agents - such
as Bustos - from having to repay to payphone investors tens of
millions of dollars in commissions that the agents received for
selling the Alpha Telcom product.   An appellate court panel
reversed the judgment against the agents.   SEC v. Ross, 504 F.3d
1130 (9th Cir. 2007).   That decision became final in February
2008.   (# 710).

The Receiver's attorneys had not served a "summons" upon
each agent, but instead had filed a disgorgement motion in the
ongoing Alpha Telcom litigation and sent a copy to each agent.

It was undisputed that most agents had received actual notice of the motion. Many sales agents affirmatively intervened as parties to the action, vigorously litigated the disgorgement motion on the merits, but lost. In re Alpha Telcom, 2004 WL 3142555 (D. Or.) (# 321).

Nevertheless, the appellate court concluded that because the Receiver's attorneys did not serve a formal "summons" upon each agent, this Court never acquired "personal jurisdiction" over them, and the judgment therefore was void. The Receiver not only couldn't enforce the judgment, but had to return to some agents money obtained from them under authority of the voided Judgment. In re Alpha Telcom, 2009 WL 1882834 (D. Or.) (# 904); In re Alpha Telcom, 2009 WL 2828495 (D. Or.) (# 930).

The Receiver decided that the cost to relitigate the matter and obtain a new judgment against the former sales agents, and then attempt to collect on that judgment, was too high to justify the expected revenue. (# 711). This Court agreed. (# 712).

The Receiver then submitted a proposed plan for winding up the Receivership and distributing the meager funds that would remain after payment of fees and expenses incurred by the Receiver and his attorneys and accountants. (## 714, 715).

**Receiver's Medical Condition and "Unauthorized Advances"**

In August 2009, Receiver Thomas Lennon suffered an incapacitating stroke. Further inquiry revealed he had a stroke in November 2001 and some unnoticed smaller vascular events prior

20 - OPINION AND ORDER

to the August 2009 event.

Just after the 2009 stroke, the Receiver's attorneys learned Lennon had taken "advances" of fees and expenses he anticipated being awarded for the work his firm had performed in some receiverships. Lennon took the "advances" prior to receiving authorization to do so from the court overseeing the Receivership. Alpha Telcom was among the cases in which Lennon took "unauthorized advances." These revelations understandably raise some concerns.

Lennon resigned. (# 960). The Court appointed Michael Grassmueck as the Distribution Agent to assist in winding up this case. (# 966).

A.    Whether Lennon's Medical Condition Adversely Affected the Results of this Case

The Court does not believe Lennon's medical condition while Receiver adversely affected the results of this case. There is no credible evidence Lennon's mental acuity was significantly impaired when he was making important decisions or recommendations concerning this case. Moreover, court approval was required for key decisions. After 2002, Lennon's direct personal involvement was less frequent, due to the nature of the tasks performed. Regardless, the investors' money already was gone before the Receivership was imposed. As detailed above, the payphone operations were unprofitable, and the payphone industry was rapidly declining. Alpha Telcom had filed for bankruptcy.

Little could be done to alter those facts.  The only prospect of a significant recovery for investors was disgorgement from those who profited from Alpha Telcom.

Important decisions and recommendations by the Receiver were primarily made in 2001 and 2002 and, to a much lesser extent, in 2003.  The Receiver's October 18, 2001 Report (# 59), which preceded the 2001 stroke, discusses his efforts to reorganize and stabilize the company, identify and marshal assets, and offers a preliminary analysis of the situation.  Reports filed in the Bankruptcy Court also detail activities by the Receiver preceding the 2001 stroke.

By late January 2002, the Receiver had submitted a more detailed analysis, recommended immediate commencement of preparations for selling all Alpha Telcom's assets, and explained why that step was warranted.  (## 166, 168).  By the end of September 2002--little more than a year after the Receiver was appointed and less than a year after his 2001 stroke--Alpha Telcom had been closed and most of its assets liquidated.

Additionally, the Receiver's decisions and recommendations were not made in isolation.  Lennon worked with experienced attorneys and accountants, and a staff of project managers, assistant project managers, and others.  Additional professionals were retained as needed.

Major decisions required approval from the Bankruptcy Court, this Court, or both, after considering any opposition to the

proposed action and exercising independent judgment.

After September 2002, what remained to be done was mostly the disgorgement proceedings against sales agents who profited from Alpha Telcom, pursuing assets that had been concealed or transferred and, eventually, deciding who would receive any funds the Receiver was able to recover.

While some of that activity was labor intensive, it mostly involved work by the Receiver's attorneys, accountants, and staff acting under the Receiver's direction and supervision. Answering inquiries from thousands of investors and creditors also was a labor intensive task best handled on a day-to-day basis by the Receiver's staff.

The billing records reflect this division of labor and the various phases of the Receivership. The largest number of hours Lennon billed for work he performed was in 2001 (90.4 hours in just over four months). The Receivership was new, much work had to be completed and decisions made within a short time, and Lennon's extensive experience was regularly required.

As the case progressed, there was less need for Lennon's direct involvement on a day-to-day basis.

////

////

////

////

| Year | Hours Lennon Personally Billed | Year | Hours Lennon Personally Billed | Year | Hours Lennon Personally Billed |
|------|-------|------|-------|------|-------|
| 2001 | 90.4 | 2004 | 15.9 | 2007 | 0.9 |
| 2002 | 55.6 | 2005 | 18.3 | 2008 | 0.5    [13] |
| 2003 | 47.7 | 2006 | 2.7 | 2009 | 0.0 |

After 2001, the Receivership had moved into a different phase. Major decisions had been made and a course established, and Lennon's managers and professionals were knowledgeable about the case and able to handle routine matters. One of Lennon's attorneys summarized his law firms' interactions with Lennon:

> At the outset of cases, where Mr. Lennon's strategic input was required, communications were more frequent. As the case progressed and there were mostly day-to-day operational issues to be addressed * * * [we] worked primarily through Mr. Lennon's staff members except when it was necessary to involve Mr. Lennon to address an important issue in connection with the case.

Zaro Decl. (# 972), p. 3.

After 2001, the majority of hours billed by Lennon's firm (other than for paralegal-style tasks) was for work performed by William "Bill" Johnston, who had worked extensively with Lennon[14] and served as Project Manager in Alpha Telcom.

---

[13]   Lennon has not billed for any hours his firm incurred after April 2008.

[14]   For instance, from September 2000 through January 2002 Johnston billed 1,724 hours and Lennon 1,340 hours for their work in SEC v. Capital Consultants, LLC, Case No. 3:00-cv-1290-KI (D. Or.). First Interim Fee Application of Thomas F. Lennon, Ex. B (Cap. Consult. # 170); Second Interim Fee Application of Thomas F. Lennon, Ex. A (Cap. Consult. # 1043).

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| W. Johnston hours | 124.8 | 373.7 | 671.3 | 474.8 | 434.4 | 198.7 | 130.8 | 33.0 |
| All others billing over $100/hr, including Lennon | 189.5 | 68.3 | 246.6 | 223.2 | 24.3 | 3.8 | 0.9 | 0.5 |
| Johnston % of all hours >$100/hr | 39.7 % | 84.5% | 73.1% | 68.0% | 94.7% | 98.4% | 99.3% | 98.5% |

Lennon seems to have made a strong recovery from his November 2001 stroke. He continued to interact with this Court and the Bankruptcy Court, and with attorneys, accountants, staff, and other professionals in this and other receiverships, including Capital Consultants overseen by Judge King here in the District of Oregon.

Karen Matteson, an SEC attorney, knew Lennon had suffered a stroke in 2001. Although Lennon had some speech difficulties following the 2001 stroke, Matteson stated Lennon's speech improved over time. June 6, 2012 Matteson Decl. ¶ 5. More importantly, Matteson stated that Lennon "did not seem to have any difficulty understanding or responding to" Matteson's questions. Id. Over the next few years, Matteson interacted with Lennon's professionals more often than she interacted with Lennon himself.

Following the 2001 stroke, Lennon noticed he occasionally was laughing or crying where such a response was inappropriate. Donald Adema Decl. ¶ 4 (# 967). These symptoms, sometimes

referred to as emotional lability or pseudobulbar affect, are not unusual in stroke survivors and can also occur in patients with other neurological conditions such as multiple sclerosis. Lennon's doctor prescribed a common drug unlikely to impair Lennon's congnitive functioning. Lennon reportedly responded well to that treatment. In fact, "[n]eurologists and rehab staff were amazed" with Lennon's recovery. Id. at ¶ 3.

Lennon's daughter recalls an incident around May 2002 when Lennon became frustrated with the lack of help a store clerk was providing and uncharacteristically uttered an expletive. Jessica Lennon Decl. (# 1004) ¶ 5. There can be many explanations for that event. It does not establish that he was unable to perform his duties as Receiver.[15]

In October 2009, Matteson learned Lennon had suffered a severe stroke in August of that year and that Lennon could no longer continue as Receiver. June 6, 2012 Matteson Decl. at ¶ 3. Unfortunately, Lennon's "second major stroke in 2009 was devastating, and his ability to make safe and sound decisions rapidly diminished." Donald Adema Decl. (#1002) ¶ 6. Closer to August 2009, it is possible the Receiver may have begun to experience some problems due to undetected smaller vascular events or other reasons. By then, Lennon's personal involvement

---

[15] In evaluating the statements by Lennon's daughter, the Court recognizes they were made not only with the benefit of hindsight, knowing the final result, but by a loving daughter seeking a medical explanation for why the father she respects began taking "unauthorized advances."

in this case was limited and had been for several years.[16]  As noted, any significant recommendations or decisions by the Receiver or his attorneys during that time period were reviewed by this Court, and a few overruled.  See, e.g., Opinion and Order of June 26, 2009 (# 904) and Opinion and Order of Sept. 1, 2009 (# 930) (rejecting arguments asserted by the Receiver's counsel).

The Court is confident that any impairment the Receiver may have experienced did not impact the outcome for the payphone investors and creditors.  Whether by design or otherwise, Alpha Telcom was operating as a ponzi-style scheme.  By the time a Receivership was imposed, the investors' money was already gone and the company's situation hopeless.  The only real chance of recovering any significant amounts for the investors was through disgorgement proceedings against the sales agents and others who profited from the Alpha Telcom scheme.

The payphones were unprofitable, a fact the Receiver soon recognized he could not change.  He tried to stem the company's losses and to salvage what he could for the investors by selling the payphone routes.  However, unprofitable payphone routes and used phone equipment scattered around the country were of little value in a rapidly declining industry.

The Receiver didn't create those facts.  He inherited them from the people who had operated Alpha Telcom and who, in return

---

[16]As noted above, Lennon had very little direct involvement in this case after 2003.  From 2006 on, Lennon billed only 4.1 hours for work performed.

27 - OPINION AND ORDER

for a large percentage of every sale, induced thousands of people
to invest $133 million in a "too good to be true" scheme and then
used a variety of tactics to avoid repaying that money.

Lennon's resignation in October 2009 (and the circumstances
surrounding it) were among multiple issues that have contributed
to the delay in closing this case. Neither the Receiver's firm,
nor his attorneys or accountants, have asked to be compensated
for any fees or expenses incurred since April 2008. A
Distribution Agent has been retained to perform various tasks
necessary to wind up the Receivership, but such closing expenses
already were anticipated in the budget submitted to the Court in
October 2008 (# 714).

In conclusion, there is no reason to believe the results in
this case would have been more favorable for the investors or
creditors but for the Receiver's medical condition.

B.   The Receiver's "Unauthorized Advances"

    1.   The Discovery of the "Unauthorized Advances"

The Allen Matkins law firm represented Lennon in federal
receivership cases since approximately 1997. In August 2009,
while winding up the Tuco Trading receivership,[17] Allen Matkins
received an accounting that mentioned an "advance." Zaro Decl.
(# 972), p. 4, Zaro Decl. # 955, p.2. Further inquiry revealed
Lennon had taken "advances" of fees and expenses he anticipated

---

[17]   SEC v. Tuco Trading, LLC, Case No. 08-cv-00400-DMS (S.D.
Calif.).

being awarded for work performed in Tuco Trading. Unfortunately, Lennon took the "advances" prior to receiving any authorization from the court.

Receivers may work hundreds or thousands of hours on a case and incur expenses such as photocopying, travel, or salaries for employees who assist the receiver. Attorneys and accountants for a receiver also incur many "billable hours" and other expenses. They understandably anticipate payment for time and expenses reasonably incurred, but are not permitted to simply pay themselves whatever they think appropriate. Rather, the court overseeing a receivership decides what compensation will be paid and when.

Sometimes this can impose a hardship. A receiver, and his attorneys and accountants, may have to wait several years or longer to be paid for work performed and expenses incurred. However, anyone experienced in receiverships knows the rules. Moreover, there are procedures for seeking an "interim" award of fees and expenses in certain circumstances.[18]

While inquiring about the advances, Allen Matkins learned of Lennon's recent stroke. (# 955, p. 2). Allen Matkins informed counsel for the SEC in Tuco Trading about Lennon's illness and the financial irregularities. (# 955, p. 3). Allen Matkins

---

[18] In Capital Consultants, Lennon submitted six such applications in the first six years, but the available cash on hand was more than enough to accommodate those requests. Memorandum in Support of Fee Application (Cap. Consult. # 171), p.6. The Alpha Telcom Receivership had no such surplus.

eventually was able to speak with Lennon, who agreed to return all outstanding "advances" in <u>Tuco Trading</u>, totaling $60,101.[19]

Allen Matkins initially was aware only of "advances" taken in <u>Tuco Trading</u>.  (# 955, p. 3; # 972, p. 5).  Upon further investigation, however, Allen Matkins learned of other advances. After several weeks of work, compounded by the fact that Lennon was hospitalized, Lennon's staff provided Allen Matkins detailed information about the specific cases and amounts taken.

## 2.   The "Unauthorized Advances" in Alpha Telcom

A spreadsheet provided by Lennon's staff shows the amounts Lennon is believed to have "advanced" in the Alpha Telcom Receivership and related Bankruptcy proceeding (the figures are combined), and where the funds apparently went.  Report by Plaintiff SEC Regarding Receipt of Monies by Former Receiver (# 984), Ex. 1 to Decl of Lorraine Pearson.

The Spreadsheet shows that as of September 2009, Lennon and his firm had been judicially authorized to receive $1,162,104.82 as compensation for fees and expenses, but actually had taken $1,408.156.95, a difference of $246,052.13.  <u>Id.</u>

An SEC accountant reviewed the Spreadsheet, available bank

---

[19]    On September 4, 2009, Allen Matkins informed the court overseeing that receivership.  Notice of Corrections to Application for Approval and Payment of Fees and Costs to Thomas F. Lennon (Tuco # 163).  The Notice stated Lennon had now "returned the advances to the Tuco estate together with interest that would have been earned on the amounts advanced."  <u>Id.</u>, p. 1. On September 10, 2009, Lennon was awarded the full amount of fees and expenses he had requested.  Order on Final Fee Applications Of Receiver and His Professionals (Tuco # 165).

records, and other documents.  She concluded the Spreadsheet seemed substantially accurate, except for two additional withdrawals totaling $10,395.81.  Decl. of Lorraine Pearson (# 984).  The net amount taken in Alpha Telcom was $256,477.94.

The first "unauthorized advance" in the Alpha Telcom cases was in November 2001, to pay a project manager or assistant project manager working on these cases.  Lennon classified his managers as independent contractors.  Unlike the attorneys and accountants, who had to wait and apply to the Court for payment of fees and expenses, Lennon appears to have paid these managers directly.  Lennon then included their hours in the fee applications his firm submitted to the Court.[20]

In January 2002, Lennon took an "unauthorized draw" of $68,485.00 to reimburse his company for payments it had made to two managers from August through October 2001.  By the end of June 2003, Lennon had taken $325,216.95 in "unauthorized advances" (or draws), all of which apparently was used to pay managers working for Lennon on Alpha Telcom matters.

In July and August 2003, Lennon "drew" a total of $62,000 and paid it to his firm, perhaps anticipating the Bankruptcy Court would soon grant his pending fee request.  By August 2003, Lennon had taken at least $401,466.95 in unauthorized "draws" and

---

[20]    Lennon billed their hours at a higher hourly rate than he paid the manager, an accepted practice in many professions.

"advances."[21]   That is a large sum, albeit less than half what
Lennon expected he eventually would be paid for work done and
expenses incurred to that point.

In September 2003, the Bankruptcy Court authorized payment
to Lennon of $932,217.32 in fees and costs for his firm's work in
the bankruptcy proceeding.   Lennon did not immediately pay
himself the entire amount awarded by the Bankruptcy Court,
possibly because Alpha Telcom's available cash was very limited.

During September 2003, Lennon paid himself $217,401.44 in
addition to the usual payments to his managers.   Even when added
to the money Lennon previously had taken, he still had a credit
of approximately $300,000.

For over a year, Lennon remained "in the black," entitled to
be paid more money than he actually had taken.   Lennon gradually
used up that credit, however, paying some to himself as fees and
some in monthly payments to his managers.

In December 2004, Lennon paid himself $148,510.32 in
addition to the payments to his managers.   Lennon now was in the
red again, having taken about $84,500 more than authorized.   From
April through November 2005, Lennon took an additional $293,500
in "unauthorized draws" in addition to the usual monthly
"unauthorized advances" to pay his project manager.

In October 2005, Lennon asked this Court to award him

---

[21]     The exact amount depends on the timing of the
$10,395.81 in additional payments identified by the SEC
accountant.

$459,775.00 for fees and $5,391.16 for expenses incurred through December 2004. (## 436-38). Lennon did not disclose he already had taken at least $382,399.63 in "unauthorized" draws and advances beyond what the Bankruptcy Court had authorized him to take. Instead, Lennon let this Court believe that he, his attorneys and accountants, had all been working without payment since August 2001 (apart from any compensation from the Bankruptcy Court). From all indications, the law firms and accountants did go unpaid during that time. Lennon (and his managers) did not.

The SEC also was deceived. <u>See</u> Statement by Plaintiff SEC Regarding Interim Fee Applications of Receiver and his Professionals (# 680), p. 4 ("Although the Receiver and his professionals did receive fees in the related bankruptcy . . . the Receiver and his professionals have not been paid anything for their work in this action, which has been pending for four and one-half years").

By September 2006, Lennon had taken at least $451,532.08 more than he was authorized to (after deducting the sums awarded by the Bankruptcy Court). During the five years since his appointment, Lennon had taken over $850,000 in "unauthorized advances," though some of that money eventually became "authorized" when the Bankruptcy Court awarded Lennon fees.

Had this Court awarded Lennon the entire $465,166.16 he requested (and from prior experience he likely expected to

receive), it would have been sufficient, albeit not by much, to cover the amount Lennon had taken.

This Court did not rubber-stamp Lennon's fee application. Instead, in October 2006, the Court awarded Lennon interim fees of only $229,887.50, i.e., 50% of what the Lennon had requested, and interim costs of $5,391.16.   In re Alpha Telcom, 2006 WL 3085616 (D. Or. 2006) (# 706).   Lennon had already taken far more.   The interim award reduced the net unauthorized advances as of that date to $216,253.42 (or $226,649.23, depending on the timing of the additional payments identified by the SEC).

Thereafter, Lennon limited his "advances" from Alpha Telcom. He did take "unauthorized advances" every month to pay his project manager, a practice that continued up until Lennon became incapacitated and the "advances" came to light.

**3.   How the Unauthorized Advances Impacted the Receivership**

The Receivership did not lose very much in interest revenue, considering (i) the relatively small sums the Receivership had (or was supposed to have) during the relevant time period, (ii) very low interest rates in recent years, and (iii) the kinds of investments or accounts Receivership funds typically are kept in, which generally emphasize safety and (if appropriate) liquidity.

When the Bankruptcy Court awarded the Receiver fees and costs, he did not immediately take the full amount due, but left $300,000 behind, which he gradually drew over a 15 month period. The Court also observes it was not until late October 2006 that

34 - OPINION AND ORDER

the Court ruled on the Receiver's request for fees dating back as
far as August 2001, and then the Court awarded only half the
amount requested.  It is now 2013 and the Court is first ruling
on the Receiver's request for fees dating back as far as January
2005 and a renewed request for fees dating back to August 2001.
The Receiver and his attorneys share some responsibility for
those delays, but not all.  Interest was not and will not be paid
to the former Receiver for any fees or expenses he is awarded.
The "interest" issue thus cuts both ways.

     The Court also has considered whether the unauthorized
advances taken by the Receiver had a substantial adverse impact
in other ways upon the Receivership, such as diminution of
capital.  Lack of capital was an issue in the first year of the
Receivership, when Alpha lacked funds to continue operating the
payphones.  However, given the rate Alpha was burning through
cash, and how much was needed to keep the payphones operating,
the unauthorized advances made little if any difference.[22]  It
also does not seem likely that the Bankruptcy Court would have
authorized spending all remaining capital in a desperate effort
to keep the payphones operational for another month or so, if
that were possible, leaving nothing in reserve for payment of

---

     [22]   When the Receiver recommended an immediate sale of Alpha
Telcom's payphone routes, the total amount of unauthorized
advances to date was under $100,000.  By the time the payphone
routes had been sold or abandoned, and the company closed, the
total unauthorized advances had reached approximately $200,000.
That would not have made much difference in the outcome.

fees incurred by the Receiver, and his attorneys and accountants.

Acts that call into doubt the Receiver's honesty in one area can give rise to questions about his conduct in other areas. A receiver may: handle substantial sums of cash, valuable inventory or other assets; be in a position to recommend which claims be paid or compromised, which contracts be rejected or retained, and which employees to retain, terminate, or hire; negotiate asset sales; and more. There can be considerable potential for wrongdoing. However, the Court has found no indication of any such wrongdoing here.

Additionally, as noted above, Karen Matteson of the SEC, following a thorough review and audit of the Receivership, concluded that other than time and resources spent by the SEC investigating this matter, "it does not appear [Lennon's] actions damaged the receivership estate itself beyond the amounts advanced." July 6, 2012 Matteson Decl. ¶ 10. The Court concurs with Matteson's conclusion.

### Outstanding Fee Petitions

For present purposes, the Court will not attempt to understand why Lennon took unauthorized advances. Two points bear emphasis.

First, unauthorized advances by a receiver are unacceptable. It does not matter why it was done. Second, after careful consideration, and as described above, the Court does not believe Lennon's medical condition while Receiver or his taking of

unauthorized advancements had a substantial adverse affect on the results in this case.  That said, they did cause some delay in closing the case and distributing the remaining assets.

To date, Lennon has not repaid the money taken from the Alpha Telcom receivership.  On October 31, 2011, the Court ordered Lennon to show cause why he should not be required to return the $256,447.94 he drew and/or advanced to himself without approval by this Court.  At the time the Court learned of Lennon's "unauthorized advances," the Court had under advisement application for:

(1) $182,993.91 in fees for services performed from January 1, 2005 through April 30, 2008 and $1,428.81 in costs for that period; and

(2) $206,898.75 in fees for services performed prior to January 1, 2005, which the Court previously withheld.

The Court previously noted the Receiver and his attorneys thus far had recovered very little money for the investors, and that fees sought by the Receiver, lawyers, and accountants might consume all remaining funds, leaving nothing for the investors. In re Alpha Telcom, 2006 WL 3085616 (# 706).  The Receiver and his attorneys have since agreed to reduce their fee requests.

The $182,993.91 the Receiver requested for services after January 1, 2005, and the $206,898.75 the Receiver requested for services before that date, are ten percent less than originally was sought (for the fees prior to 2005) or originally billed (for

services after 2004). These reductions total $43,162.65. The Receiver's offer to accept this reduction was not a response to the revelations of unauthorized advances but was made well before that information emerged.

The total amount requested by the Receiver is $389,892.66. The total outstanding "unauthorized advances" is $256,447.94. The difference between the two amounts is $133,444.72. As described above, the Court concludes that neither Lennon's medical condition nor the "unauthorized advances" impacted the amount left to distribute to the payphone investors. The Court therefore turns now to the pending fee requests.

### Standards

The court appointing the receiver has full power to fix the compensation of such receiver and the compensation of the receiver's attorney or attorneys. <u>Drilling & Exploration Corp. v. Webster</u>, 69 F.2d 416, 418 (9th Cir. 1934). Many factors enter into that calculus. <u>See, e.g. United States v. Code Products Corp.</u>, 362 F.2d 669, 673 (3d Cir. 1966) (primary considerations in fixing receiver's compensation are the fair value of his time, labor and skill measured by conservative business standards; the degree of activity, integrity and dispatch with which work is conducted; and the result obtained, the last being a "critical factor"); <u>In re Imperial '400' National, Inc.</u>, 432 F.2d 232, 237 (3d Cir. 1970) (court should consider economy of administration, the burden the estate may safely be able to bear, the amount of

time required to perform the necessary services, and the overall value of those services to the estate).

In short, the court has considerable discretion in fashioning a fee award that is appropriate under the circumstances, Gaskill v. Gordon, 27 F.3d 248, 253 (7th Cir. 1994), and that will reasonably, but not excessively, compensate the professionals for their efforts. In re Continental Ill. Sec. Litig., 962 F.2d 566, 572-73 (7th Cir. 1992).

## Discussion

As the Court noted in the Order on the interim fee applications, when a receiver reasonably and diligently discharges his duties, the receiver is entitled to fair compensation for those efforts. SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992); Donovan v. Robbins, 588 F. Supp. 1268, 1273 (N.D. Ill. 1984). The result obtained is always a "critical factor." Elliott, 953 F.2d at 1577.

As detailed above, the Receiver faced numerous hurdles in securing any distribution at all for the payphone investors. The Receiver had to obtain an accurate financial outlook for Alpha Telcom by wading through woefully inadequate corporate records. By the time the Receiver was appointed, Alpha Telcom had filed for bankruptcy, possessing under $500,000 despite facing nearly $6,000,000 in unpaid trade creditor claims. Barclay Decl. in Support of Sale (# 175) ¶ 5. Unfortunately, the money was already gone before the SEC filed this complaint.

The Receiver cannot be faulted for the expenses incurred operating Alpha Telcom's business pending the outcome of the trial.   This Court denied the Receiver's motion, supported by the SEC, to immediately shut down Alpha Telcom's operations.   As noted above, Alpha Telcom's operations involved 4,000 different site contracts in 43 states.   Operating Alpha Telcom's business pending the outcome of the trial proved costly, although the Receiver took steps - outlined above - to trim expenses and reduce operating losses.

Following trial, the Receiver liquidated Alpha Telcom's remaining assets.   Unfortunately, and through no fault of the Receiver, many of Alpha Telcom's payphones and "routes" fetched no bids at auction and proved worthless.   Still, the Receiver incurred significant expenses in winding up the affairs of Alpha Telcom.

Taken in context, the Receiver obtained decent results in this case.   The Receiver obtained $1,500,000 through negotiations with the IRS. The Receiver also negotiated settlements with many of the agents who sold investors the Alpha Telcom payphone program.   The Receiver obtained a judgment from this Court for the disgorgement of over $20,000,000 in commissions from former sales agents.   As noted, that judgment was reversed on appeal. SEC v. Ross, 504 F.3d 1130 (9th Cir. 2007).   In hindsight, the Receiver should have properly served the former investors.   That said, this Court, as well as the SEC, believed the Receiver's

attempts sufficient to justify the disgorgement order.
Unfortunately for the payphone investors, the Ninth Circuit Court
of Appeals disagreed.

Many of the fees requested involve work performed in the
course of the appeal of the disgorgement order.  Recovering the
ill-gained commissions provided the last remaining chance for any
significant recovery for the investors.  The protracted appeal
lasted three years.  That the Ninth Circuit ultimately reversed
the order granting the motion for disgorgement does not render
the hours spent defending the appeal unnecessary or unreasonable.

Shortly after the Ninth Circuit ruled on the appeal, the
Receiver recommended closing the Receivership.  The Court agreed
and ordered the Receiver to file a final plan for distribution.
Multiple events then delayed the final distribution.

First, the Court spent much time dealing with Ernest Bustos.
The Court's views on Bustos and the Payphone Owners Legal Fund
are well documented, most recently in a April 18, 2012 Order (#
1026).[23]  Recent documents received during the Notice and Comment
period establish that Bustos continues to solicit funds from
investors.

Second, the Court learned of Lennon's August 2009 stroke and
of the "unauthorized advances."  As described above, the Court
concludes neither Lennon's medical condition, nor the

---

[23]The April 18, 2012 Order is also posted online at
http://www.alphatelcom.com/

41 - OPINION AND ORDER

"unauthorized advances" had a material affect on the outcome of this case. Although the Court will not order Lennon to disgorge any of the fees advanced, any fees advanced will of course be deducted from the awarded fees.

The SEC reviewed the fee requests and, following discounts taken by the Receiver and his attorneys, recommends granting the fee requests. (# 803). The SEC has extensive experience in similar cases involving a Receivership and the Court therefore takes the SEC's recommendations into consideration.

The Court also notes the many comments received from investors. The Court received over 1000 comment forms and read each and every form received. The comments reveal that many investors were elderly and counted on this "safe" investment for fixed income during retirement. Many investors lost their life savings. Many investors incorrectly believe the Receiver or the SEC took their investments. As noted, the money was gone before the SEC filed this action.

Of the comments received, slightly less than half stated the Receiver was entitled to some compensation for work performed, but not the full amount requested. About the same amount opposed the request for fees and expenses in its entirety. About 15% supported the request for fees and expenses in its entirety.

Sadly - but not surprisingly - the Court soon learned that Ernest Bustos once again used the opportunity for notice and comment to solicit funds from the investors. Not long after the

42 - OPINION AND ORDER

original yellow comment forms arrived, the Court began receiving white comment forms marked with a handwritten "Amended" at the top.

Many of the "Amended" comments state the options are unacceptable and demand to be made whole by holding the Receiver responsible for the losses. The comments mirror recommendations provided in Bustos's July 27, 2012 letter to some investors.

As detailed above, neither Lennon's medical condition nor the "unauthorized advances" had a material affect on the outcome of this matter. By the time the Court appointed the Receiver, the investors' money was already gone. In fact, it is likely that absent the Receiver's actions in this case, no funds would remain for any distribution at all. Additionally, had the SEC not intervened, countless more investors would have been conned.

That said, results are always a critical factor. Although the hourly fees requested by the Receiver are reasonable, the Court must take all the circumstances involved in this matter into account. There is no excuse for taking "unauthorized advances." Additionally, many of the fees were incurred during the disgorgement proceedings, after Alpha Telcom's affairs were wound down. As noted, the disgorgement proceedings were unsuccessful. Considering that the result achieved is a critical factor, but taking all of the unique circumstances involved in this matter into account, the Court will reduce the Receiver's fees and Allen Matkins' fees by 25%. The 25% reduction is on top

43 - OPINION AND ORDER

of the 10% reduction already voluntarily made by the Receiver and the 20% reduction voluntarily made by Allen Matkins.  The Court finds no reason to discount the accountants' fees by 25% as the accountants bear little responsibility for the failed disgorgement proceedings.

The Court provided an extensive background of the case, which includes descriptions of the extensive amount of work required in this case.  The Court will not rehash that summary below, but took all the factors involved in this unique situation into account when reviewing the requests for fees.  The Court inquired as to all of the hours documented and submitted.  The Court reviewed the hourly fees sought, taking into account the Receiver and his professionals' experience working in similar matters, the complexity of this case, and hourly fee awards in other receiverships. Other than the meager result ultimately obtained in this matter, the Receiver and his professionals performed adequately and the hours and rates requested are reasonable.  With the exception of the failed disgorgement proceedings, the meager result obtained was due to the facts the Receiver inherited.  The Court notes the opinion of the SEC that the fee requests and hours of work performed here are indeed reasonable.  See docket #803, pp 4-9.  Finally, the Court reviewed documents submitted in the bankruptcy proceedings but found no accounts of "double billing."

**The Receiver**

The Receiver seeks $206,898.75 in fees previously withheld by the Court (for work performed up to December 31, 2004) and $182,993.91 for work performed since January 1, 2005. Both requests include the Receiver's voluntary 10% reduction. The total amount in fees currently sought is $389,892.66. 75% of $389,892.66 is $292,419.50, which is what the Court awards the Receiver in fees. The Court also awards the Receiver $1,428.81 in costs. The total amount of fees and costs now awarded to the Receiver is $293,848.31. Offset against the $256,447.94 the Receiver took in "unauthorized advances" results in a balance of $37,400.37 owed to the Receiver.

**Allen Matkins**

Allen Matkins seeks $381,316.08 for fees previously withheld and $297,935.20 for fees incurred as of January 1, 2005, for a total amount of $679,251.28 in fees. This amount reflects Allen Matkins' voluntary 20% reduction. The Court subtracts the fees sought by Foster Pepper from the award to Allen Matkins. Foster Pepper worked as local counsel on this case and seeks $47,802.76 in outstanding fees. The Receiver's decision to employ out-of-state counsel in this matter should not result in a diminished return to the investors. Instead, any fees incurred due to the need for local counsel are to be borne by Allen Matkins. Deducting $47,802.76 from $679,251.28 equals $631,448.52. For similar reasons as noted above, the Court deducts an additional

25%, largely due to the meager results obtained in this case.
Therefore, the Court awards Allen Matkins $473,586.39 in fees.
The Court grants Allen Matkins' request for $11,998.90 in costs
previously withheld and $26,771.33 in costs incurred since
January 1, 2005 for a total award of $38,770.23 in costs.

**Foster Pepper**

Foster Pepper seeks $26,433.26 in fees previously withheld
and $21,369.50 for fees incurred since January 1, 2005. The
requested amount included a reserve of $2,000 for winding down
the case. Foster Pepper seeks $2,814.79 in costs. After
reviewing the documents submitted, the Court finds the requests
reasonable and grants Foster Pepper's request for $47,802.76 in
fees and $2,814.79 in costs. The Court finds no justification
for cutting Foster Pepper's request by %25 due to the results
obtained.

**Barclay**

Barclay seeks $47,343.97 in fees previously withheld and
$17,706 for fees incurred since January 1, 2005 for a total of
$65,049.26. Barclay also seeks $202.56 in costs. The Court
finds the requests reasonable and grants Barclay's request for
$65,049.26 in fees and $202.56 in costs. The Court finds no
justification for cutting Barclay's request by %25 due to the
results obtained.

**LECG**

LECG seeks $34,542.50 in fees. That amount includes a

$10,000.00 reserve for fees anticipated to be incurred in winding down the case and properly disposing of records.  LECG also seeks $235.56 in costs.  The Court finds the requests reasonable and grants LECG's request for $34,542.50 in fees and $235.56 in costs.  The Court finds no justification for cutting LECG's request by %25 due to the results obtained.

## CONCLUSION

The Court awards the Receiver $292,419.50 in fees and $1,428.81 in costs.  Offset against the $256,447.94 the Receiver took in "unauthorized advances" results in a balance of $37,400.37 owed to the Receiver. The Court awards Allen Matkins $473,586.39 in fees and $38,770.23 in costs.  The Court awards Foster Pepper $47,802.76 in fees and $2,814.79 in costs.  The Court awards Barclay $65,049.26 in fees and $202.56 in costs. The Court awards LECG $34,542.50 in fees and $235.56 in costs.

IT IS SO ORDERED.

DATED this ___6___ day of March, 2013.

OWEN M. PANNER
U.S. Senior District Judge